1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10                    San Francisco Division

11   JANE ROE, et al.,                          Case No. 14-cv-03616-LB
                                                        19-cv-03960-LB
12              Plaintiffs,
                                                 **ORDER GRANTING MOTIONS FOR**
13        v.                                     **PRELIMINARY APPROVAL AND**
                                                 **LEAVE TO FILE AMENDED**
14   SFBSC MANAGEMENT, LLC, et al.,              **COMPLAINTS**

15              Defendants.
                                                 Re: ECF Nos. 239 (14-cv-03616-LB) and
16   JANE ROES 1 AND 2, et al.,                  107 (19-cv-03960-LB)

17              Plaintiffs,

18        v.

19   DÉJÀ VU SERVICES, INC., et al.,

20              Defendants.

21

22

23                        **INTRODUCTION**

24        The plaintiffs in two putative class and collective actions — *Roe v. SFBSC Management, LLC*,

25   No. 14-cv-03616-LB (San Francisco Action), and *Roe 1 and 2 v. Déjà Vu Services, Inc.*, No. 19-

26   cv-03960-LB (San Diego Action transferred to this district) — are current and former exotic

27   dancers who sued nightclubs and their management companies, claiming wage-and-hour

28   violations based on the defendants' allegedly misclassifying them as independent contractors and

1   engaging in "unlawful tip sharing."[1] The parties previously reached a settlement in the San

2   Francisco Action, which the court approved.[2] The Ninth Circuit reversed that approval and

3   remanded the case. *Roes 1–2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035 (9th Cir. 2019). The parties

4   then reached a global settlement in the San Francisco and San Diego cases, and the plaintiffs

5   moved for preliminary approval of the settlement and for leave to file a consolidated amended

6   complaint.[3] The court allows the consolidated complaint and approves the settlement

7   preliminarily.

### STATEMENT

9   **1.  The Lawsuits**

10      The following sections review lawsuits, appeals, mediations, and objections relevant to the

11   settlement.

12      **1.1    Previous Proceedings in the San Francisco Action**

13      On August 8, 2014, the plaintiffs filed a putative class and collective action on behalf of

14   dancers who performed at eleven nightclubs in San Francisco, California, claiming that the

15   nightclubs and their management company (SFBSC Management) violated wage-and-hours laws

16   (the Fair Labor Standards Act (FLSA), the California Labor Code, and other state laws) by

17   misclassifying the dancers as independent contractors (when they in fact were employees) and by

18   "unlawful tip-splitting."[4] After the court denied the defendants' motion to compel arbitration, the

19   defendants appealed to the Ninth Circuit.[5] Then, after three in-person mediations and many

20   telephone conferences with Ninth Circuit mediator Peter Sherwood, the parties executed a

---

[1] Mot., San Francisco Action – ECF No. 239 at 12, 14. Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Order, *id.* – ECF No. 178.

[3] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 47–150; Mot., *id.* – ECF No. 239; Mot., San Diego Action – ECF No. 107. The settlement filings are the same in both cases. The order cites the documents in the low-numbered San Francisco Action.

[4] Thompson Decl., San Francisco Action – ECF No. 239-1 at 7 (¶ 20); Am. Compl., *id.* – ECF No. 11.

[5] Order, *id*. – ECF No. 53; Notice of Appeal, *id.* – ECF No. 58.

United States District Court
Northern District of California

settlement agreement and, as part of that process, dismissed the appeal without prejudice to its reinstatement if the court did not approve the settlement.[6]

The court approved the settlement: (1) $5 million that had the following tiers: a first-tier cash pool of $2 million, a second-tier cash pool of up to $1 million, and a dance-fee pool of up to $1 million that involved redeeming the fees (the mandatory costs of the performances) by scheduling a performance; and (2) changed business practices that allowed dancers to elect to be employees or independent contractors. The dancers could opt for a cash payment (up to $800 depending on the number of months worked) or the dance-fee payment.[7]

Objectors to the settlement appealed the approval to the Ninth Circuit. On December 11, 2019, the Ninth Circuit reversed the approval on two main grounds: (1) the single mailed notice to the class members (without follow-up, either by reminder notices or electronically) was inadequate for former dancers, given the 18.5-percent claims rate for the 4,681 class members (with 560 untraceable through skip-tracing); and (2) the order did not apply the appropriate heightened scrutiny to certain settlement terms: (a) an agreement that the defendants would not object to the plaintiffs' request for fees and costs up to twenty-five percent of the settlement fund, which the Ninth Circuit viewed as a potentially collusive "Clear Sailing Agreement"; (b) the second-tier pool and dance-fee pool; and (c) the amount of the incentive awards. *Roes 1–2*, 944 F.3d at 1039, 1046–48. The court remanded for further proceedings that could include negotiating a new settlement, moving for re-approval of the settlement with a new notice plan under the applicable heightened standard, reinstating the earlier appeal of the decision denying arbitration, or proceeding to trial. *Id.* at 1060–61.

### 1.2   Michigan Action

On March 10, 2016, an entertainer in the Eastern District of Michigan filed a similar lawsuit alleging misclassification as an independent contractor. Ultimately, the case there settled in an agreement that covered all nightclubs in the United States associated with Déjà Vu Consulting (a

---

[6] Order, *id.* – ECF No. 178 at 2.

[7] *Id.* at 5–8.

settling party in the earlier San Francisco Action and in this case) except for the "associated" nightclubs in San Francisco (meaning, those involved in the San Francisco Action). On June 19, 2017, the district court approved the settlement: $6.44 million divided into three categories: a $1 million cash pool, a $4.5 million secondary pool (either dance-fee payments or credits for "daily rent" for performers), and $900,000 in fees.[8] *Doe 1–2 v. Déjà Vu Servs., Inc.*, No. 2:16-CV-10877, 2017 WL 2629101, at *1, *4 (E.D. Mich. June 19, 2017). Objectors to the settlement appealed the approval to the Sixth Circuit, which affirmed the final approval on June 3, 2019. *Doe 1–2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019).

### 1.3    Other Lawsuits in the Northern District of California

There are four related cases in the Northern District, all involving similar wage-and-hours claims: (1) *Hughes v. S.A.W. Entertainment, Ltd.*, No. 16-cv-03371-LB (putative class and collective action by plaintiffs Nicole Hughes, Angelynn Hermes, Penny Nunez, and Diana Tejada); (2) *Pera v. S.A.W. Entertainment, Ltd.*, No. 17-cv-00138-LB (putative class and collective action by plaintiffs Elana Pera and Sarah Murphy); (3) *Mehraban v. Gold Club-S.F., LLC*, No. 17-cv-05288-LB (individual claims by plaintiff Poohrawn Mehraban); and (4) *Gomez-Ortega v. Déjà Vu – San Francisco LLC*, No. 17-cv-06971-LB (putative class action by plaintiff Elaine Gomez-Ortega).

The proposed settlement and the proposed objector settlement (both discussed below) will resolve the putative class, collective, and PAGA claims in *Hughes*, *Gomez-Ortega*, and *Pera*.[9]

### 1.4    Previous Proceedings in the San Diego Action

On May 31, 2019, following the California Supreme Court's decision in *Dynamex Operations West v. Superior Ct.*, Jane Roes 1 through 4 filed a similar class and collective action in San Diego Superior Court against California nightclubs (other than those in San Francisco) alleging wage-and-hour violations predicated on the misclassification of dancers as independent contractors. 4

---

[8] Thompson Decl., *id.* – ECF No. 239-1 at 5–7 (¶¶ 12–19).

[9] Joint Case Mgmt. Statement, *id.* – ECF No. 250 at 4 (stating that the settlement "will resolve the . . . claims in *Hughes* and *Gomez-Ortega*"); Pls.' Suppl. Br., *id.* – ECF No. 263 at 3 (describing "a full and final release of all claims Objectors have alleged against Defendants, including in connection with the related lawsuits").

1    Cal. 5th 903 (2018) (holding that "employment status" under the California Industrial Welfare

2    Commission Wage Orders is governed by the "ABC" test, which essentially presumes that

3    workers are employees, not contractors). They also sent a letter to the California Labor and

4    Workforce Development Agency (LWDA) pursuant to the PAGA to reflect their intent to amend

5    the complaint to add a PAGA claim.[10] The defendants moved to compel arbitration in state court.

6    The parties then mediated the case and ultimately agreed to terms in a letter of understanding

7    dated August 1, 2018.[11]

8        At this point, given the objections and appeals in the Michigan and San Francisco lawsuits, the

9    plaintiffs met with the objectors' counsel and invited them to participate in the mediations to try to

10   resolve all cases. They accepted, and all parties in the San Diego and San Francisco cases and the

11   objectors mediated with Mark Rudy, a respected employment mediator. The parties were not able

12   to resolve their disputes with the objectors but did reach a settlement.[12] That settlement was $1.5

13   million, which included payments, PAGA penalties, costs, incentive awards, and attorney's fees.

14   All dancers were to be converted to employees.[13]

15       The state court granted a motion to intervene by eight dancers.[14] Then, after a hearing on

16   November 30, 2018, it denied without prejudice the plaintiffs' motion for preliminary approval of

17   the settlement, saying that it needed more information from the defendants' accountant about the

18   changed business practices in the settlement (including converting dancers from independent

19   contractors to employees) before it could grant preliminary approval. It also denied the motion to

20   compel arbitration.[15] The defendants then submitted their accountant's declaration estimating the

21   value of those changed business practices.[16]

---

[10] Thompson Decl., *id.* – ECF No. 239-1 at 3 (¶ 7).

[11] *Id.* at 14 (¶ 38).

[12] *Id.* at 14–15 (¶¶ 38–39).

[13] *Id.* at 15–16 (¶¶ 42–45).

[14] Am. Compl. in Intervention, San Diego Action – ECF No. 1-53.

[15] Thompson Decl., San Francisco Action – ECF No. 239-1 at 16 (¶ 46); Minute Order, *id.* – ECF No. 1-47.

[16] Shindel Decl. & Exs., Ex. B to Cahill Decl., *id.* – ECF No. 243 at 14–148.

United States District Court
Northern District of California

On November 30, 2018, the plaintiffs filed an amended complaint limiting the named plaintiffs to Jane Roe 1 and Jane Roe 2.[17] The intervenors filed an amended complaint in intervention adding SFBSC as a defendant.[18] SFBSC then removed the case to federal court in the Southern District of California.[19] All defendants moved for reconsideration of the order denying arbitration and moved to compel the intervenors into arbitration.[20] The San Diego district court denied a motion to remand and transferred the San Diego case to the Northern District.[21]

### 2. The Settlement Process

In addition to the parties' settlement negotiations described above, the parties resumed their settlement discussions after the Ninth Circuit's decision. They held a third full-day mediation on March 11, 2020, with Tripper Ortman, who specializes in complex class and collective actions and wage-and-hour cases.[22] The mediation included counsel for the objectors to the previous settlements, did not resolve their objections, and resulted in a basic structure for the parties' settlement of the San Francisco and San Diego lawsuits.[23] The defendants closed their operations during the pandemic, making it hard to predict future income, but by June 2021, the parties agreed to settlement terms, and on September 12, 2021, they signed the settlement agreement.[24]

The plaintiffs then moved for preliminary approval and for leave to file a consolidated complaint for both lawsuits for settlement purposes only.[25] The settling defendants in the

---

[17] First Am. Compl., San Diego Action – ECF No. 1-42.

[18] Am. Compl. in Intervention, *id.* – ECF No. 1-53.

[19] Notice of Removal, *id.* – ECF No. 1.

[20] Mots., *id.* – ECF Nos. 7–8.

[21] Order, *id.* – ECF No. 19.

[22] Mot., *id.* – ECF No. 239 at 30 & n.10; Thompson Decl., *id.* – ECF No. 239-1 at 19 (¶ 60).

[23] Thompson Decl., *id.* – ECF No. 239-1 at 19 (¶ 61).

[24] *Id.* at 19–20 (¶¶ 60–65); Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 47–150.

[25] Mot., *id.* – ECF No. 239; Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 70–73 (¶¶ 3.1–3.5); Proposed Second Am. Compl. (San Francisco Action), Ex. B to *id.* – ECF No. 239-1 at 154–201.

consolidated complaint are SFBSC Management, LLC, Chowder House, Inc., Déjà Vu – San Francisco, LLC, Roaring 20's, LLC, Garden of Eden, LLC, S.A.W. Entertainment Ltd., Déjà Vu Showgirls of San Francisco, LLC, Gold Club - S.F., LLC, Market St. Cinema, LLC, Bijou - Century, LLC, and BT California, LLC.[26]

After the plaintiffs moved for preliminary approval, the plaintiffs in the related Northern District cases (who are also class members in the San Francisco and San Diego cases) filed objections.[27] The parties then engaged in further, extensive settlement negotiations with the objectors, and the objectors agreed to withdraw their objections and release their claims against the defendants in exchange for (1) amendments to the settlement agreement, (2) enhancement payments for the objectors totaling $53,000 (with individual payments ranging from $3,500 to $10,000), and (3) $50,000 in attorney's fees for objector counsel.[28] The amendments to the settlement agreement are incorporated into the below description of the settlement's terms. In short, they are (1) an extension of the defendant's changed business practices from one to two years, and (2) a reminder notice to be sent to the class.[29]

All parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636.[30] The court held a hearing on June 30, 2022.

### 3. The Settlement Agreement

All defined terms in this Preliminary Approval Order have the same definitions as in the Settlement Agreement. (The terms are capitalized below, even if that is grammatically awkward.)

---

[26] Proposed Second Am. Compl. (San Francisco Action), Ex. B to *id.* – ECF No. 239-1 at 157–59 (¶¶ 9–20).

[27] Obj., San Diego Action – ECF No. 109; Obj., San Francisco Action – ECF No. 244.

[28] Pls.' Suppl. Br., San Francisco Action – ECF No. 263; Amendment to Settlement Agreement, Ex. 1 to Young Decl., *id.* – ECF No. 263-1 at 4–10; Withdrawal of Objs., *id.* – ECF No. 265; Liss-Riordan Decl., *id.* – ECF No. 266.

[29] Pls.' Suppl. Br., *id.* – ECF No. 263 at 2–3; Amendment to Settlement Agreement, Ex. 1 to Young Decl., *id.* – ECF No. 263-1 at 5–6.

[30] Consents, *id.* – ECF Nos. 7, 18; Consents, San Diego Action – ECF Nos. 30–33.

### 3.1    Settlement Class

The Class is "the group of all Entertainers who Performed at one or more of the Clubs at any time during the applicable Class Periods." Excluded are "those individuals who provide or who have provided services as 'headliner' or 'feature' performers unless such individual was otherwise a party to a Dancer Contract with one or more of the Clubs during the Class Periods."[31]

An Entertainer "means an individual who dances, Performs, and/or entertains, or who has danced, Performed or entertained, on the premises of an exotic dance nightclub or 'gentlemen's club' or other adult entertainment facility."[32] To Perform means "all acts of entertaining, dancing, and/or engaging in entertainment services, and all activities related thereto, at an exotic dance nightclub or 'gentlemen's club,' or other adult entertainment facility."[33] The Clubs are "the San Francisco Clubs and the Greater California Clubs" identified as such in Exhibit A to the Settlement Agreement.[34] A Dancer Contract is "a contract entered into between an Entertainer and a Club which permitted or permits the Entertainer to Perform and to engage in the sale of personal entertainment Performances or sessions for remuneration upon the Club's premises."[35]

There are two Class Periods, to reflect the different timelines and defendants in the lawsuits. The San Francisco Class Period is "the time period from August 8, 2010 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the San Francisco Clubs." The Greater California Class Period is "the time period from February 8, 2017 to November 16, 2018 for Entertainers who Performed as Independent Professional Entertainers (independent contractors) at one or more of the Greater California Clubs." "An Entertainer may be subject to both Class Periods if she Performed at one or

---

[31] Settlement Agreement, Ex. B to Thompson Decl., San Francisco Action – ECF No. 239-1 at 52 (¶ 2.9).

[32] *Id.* at 57 (¶ 2.36).

[33] *Id.* at 62 (¶ 2.66).

[34] *Id.* at 54 (¶ 2.16), 59 (¶ 2.45), 64 (¶ 2.77); List of Deft. Entities, Ex. A to *id.* – ECF No. 239-1 at 152.

[35] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 56 (¶ 2.28).

more of the San Francisco Clubs during the San Francisco Class Period and at one or more of the Greater California Club[s] during the Greater California Class Period."[36]

"Counsel understands that the individuals referenced as 'headliner' or 'feature' performers are well-known dancers who perform at the Clubs for a limited period of time based on an individually negotiated contract. Their performances are generally advertised as a special event, being hosted by the Clubs."[37]

There are approximately 8,408 class members.[38]

### 3.2    Settlement Benefits

The total Settlement Consideration is at least $6.5 million (all non-reversionary), divided into a Cash Pool of $4 million, a Dance Fee Pool of $500,000, and changed business practices valued at a minimum of $2,000,000.[39]

The Cash Pool will be reduced by the following deductions: (1) $125,000 in PAGA Payments (seventy-five percent to the LWDA and twenty-five percent to the Settlement Class Members, calculated on a pro rata basis based on the ratio of a member's Form 1099 Payments during the Class Period to the all Form 1099 Payments received by all members during their applicable Class Periods); (2) $35,000 in Enhancement Payments to the Class Representatives (with a maximum per-member payment of $5,000); (3) Administrative Costs estimated as $150,000 (originally estimated at $90,000 but then increased as a result of changes to the notice program negotiated by the objectors); and (4) any Attorneys' Fees and Expenses Award approved by the court (with expenses not to exceed $80,000 and an attorney's fees award not to exceed thirty-five percent of the Settlement Consideration, but the attorney's fees award will be reduced by $50,000 paid to

---

[36] *Id.* at 53–54 (¶ 2.14), 59 (¶ 2.47).

[37] Thompson Decl., *id.* – ECF No. 239-1 at 20 (¶ 68).

[38] *Id.* at 20–21 (¶ 69).

[39] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 79–80 (¶¶ 5.1–5.2); Pls.' Suppl. Br., *id.* – ECF No. 263 at 4–5.

United States District Court
Northern District of California

objector counsel).[40] The plaintiffs originally estimated that the deductions result in a Net Cash Fund for claims of between $1.745 million and $2.245 million.[41] But because the Administrative Costs increased by $60,000 as a result of negotiations with the objectors, the Net Cash Fund will likely be between $1.685 million and $2.185 million.

Separately from the Settlement Consideration, the defendants will pay the objectors a total of $53,000, with individual payments ranging from $3,500 to $10,000. The objectors will also opt out of the settlement, "thereby increasing funds available for the remainder of the Class."[42]

Settlement Class Members can elect to receive Dance Fee Payments, which will come out of the $500,000 Dance Fee Pool.[43] Dance Fees are the mandatory charges that customers pay to purchase performances. Electing a Dance Fee Payment means that the dancer receives 100 percent of the Dance Fee.[44] The Dance Fees will be distributed on the same formula used for the Cash Payments. That means that if the Dance Fee Payments exceed the $500,000, they will be prorated by (1) dividing the Dance Fee Claimant's Form 1099 Payments into the amount of Form 1099 Payments received by all Dance Fee Claimants, and (2) multiplying that number by $500,000. There are other limits to the Dance Fee Payments, such as choosing one Club, submitting request forms at least seven days before the desired performance date, and allowing Clubs to limit performances on any one day to seven dancers on a first-come/first-served basis. If the Settlement Class Member elects to receive her payment as a Dance Fee Payment but does not obtain her payments within the Dance Fee Payment Collection Period (meaning, within one year of the Effective Date), then the unused amount will be issued to the Dance Fee Claimant as a check.[45] If

---

[40] Mot., *id.* – ECF No. 239 at 20 & n.4; Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 60 (¶ 2.53), 79–80 (¶¶ 5.1–5.2), 97 (¶ 10.1); Amendment to Settlement Agreement, Ex. 1 to Young Decl., *id.* – ECF No. 263-1 at 6–7.

[41] Mot., *id.* – ECF No. 239 at 20 & n.4.

[42] Pls.' Suppl. Br., *id.* – ECF No. 263 at 3–4; Amendment to Settlement Agreement, Ex. 1 to Young Decl., *id.* – ECF No. 263-1 at 7.

[43] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 55 (¶ 2.27), 87 (¶ 7.1); Dance Fee Payment Election Form, Ex. E to *id.* – ECF No. 239-1 at 255–56.

[44] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 54 (¶ 2.19), 55 (¶ 2.22), 88 (¶ 7.3).

[45] *Id.* at 55 (¶ 2.23), 70 (¶ 2.93), 80–81(¶ 5.3), 85 (¶ 6.3.1), 87–90 (¶¶ 7.1–7.9).

less than $500,000 is claimed, then this "Unclaimed Dance Fee Pool . . . will be allocated to the Cash Pool," where it will be distributed to the class in cash.[46]

Settlement Class Members who do not elect to receive Dance Fee Payments will receive a Cash Payment from the Cash Pool (or more accurately from the Net Cash Fund plus the Unclaimed Dance Fee Pool) automatically, meaning, without filing any claim form.[47] The payments are calculated on a pro rata basis by dividing the Settlement Class Member's Form 1099 Payments during her Class Period by the total amount of Form 1099 Payments received by all Settlement Class Members during their applicable Class Periods. Settlement Class Members who were not issued Form 1099s will be "assigned a Form 1099 Payment number of $599."[48] The plaintiffs estimate that the average recovery, if measured by the net settlement amount, is $274.35, or five percent of the average individual damages. Considering the total Settlement Consideration of $5.5 million, the plaintiffs calculate that the settlement recovers approximately twelve percent of total damages.[49]

The agreement gives the defendants time to fund the settlement "due in large part to COVID-19."[50] The defendants will fund the Cash portion in four installments: (1) an initial payment to the Notice and Administrative Fund within five business days of the Preliminary Approval Date; (2) an initial payment of $2 million by March 1, 2022; (3) a second payment of $1 million by March 1, 2023; and (4) a final payment of the remainder by March 1, 2024.[51] Payments will be made to claimants in three installments on a pro rata basis (after the payments in the last section) as follows: (1) after approval, and assuming no appeal, but otherwise on the Effective Date (allowing for any appeal), the following will be paid out of the initial installment within thirty days: the initial pro-rata installment payment to the Cash Pool recipients, the LWDA's PAGA payment, the

---

[46] *Id.* at 70 (¶ 2.91), 80–81(¶ 5.3), 87 (¶ 7.1), 89 (¶ 7.7).

[47] *Id.* at 52 (¶ 2.5), 78 (¶ 4.11).

[48] *Id.* at 58–59 (¶ 2.44), 85 (¶ 6.3.1).

[49] Thompson Decl., *id.* – ECF No. 239-1 at 31–32 (¶ 113).

[50] Mot., *id.* – ECF No. 239 at 21.

[51] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 80–81 (¶ 5.3).

United States District Court
Northern District of California

Enhancement Payments, and fifty percent of the Attorneys' Fees and Expenses Award; and (2) again within thirty days (assuming no appeal) after the second and third payments, the Cash Pool Recipients will receive their second and third installments, and the attorneys will receive their remaining twenty-five-percent installment payments.[52] (An appeal alters those deadlines, a concept captured in the settlement agreement's Effective Date.[53])

Settlement Class Members have 180 days to cash the checks. If any checks are uncashed, the Settlement Administrator will try to find a valid mailing address and resend the check. If checks are uncashed after 180 days (after skip tracing), then the Settlement Administer will deliver the funds to the California State Controller's Unclaimed Property Fund to be held for the Settlement Class Member's (but without providing her name so as to preserve her privacy).[54]

The settlement has further relief in the form of changed business practices. The Clubs are required to "convert all Entertainers who will be performing in their facilities to employees," which means they are eligible for Social Security, Medicare, Worker's Compensation and employment insurance, and protection under federal, state, and local laws applying to employees (as opposed to independent contractors) such as the National Labor Relations Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Older Worker Benefits Act, the Fair Labor Standards Act, and the Family Medical Leave Act. This conversion was "completed by November 16, 2018." The agreement provides that the Clubs can alter their employment relationship with the Entertainers only if the law in California about the distinction between employees and independent contractors changes to modify or invalidate, in whole or in part, the "ABC" test in *Dynamex*.[55] The employees will also receive further benefits not required to be remitted by law, including commission payments of a minimum of forty percent on their dance sales and a $25 monthly footwear allowance (the

---

[52] *Id.* at 82–83 (¶ 5.5.2).

[53] *Id.* at 83–84 (¶ 5.5.3–5.5.5).

[54] *Id.* at 86–87 (¶ 6.6).

[55] Mot., *id.* – ECF No. 239 at 22–23; Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 92 (¶ 9.1), 93–94 (¶ 9.4), 96 (¶ 9.10).

Enhanced Terms of Employment), for at least two years following final approval (increased from one to two years as a result of negotiations with the objectors).[56]

The agreement originally valued the benefits to dancers from the changed business practices "at a minimum of $1,000,000," a valuation that was "significantly conservative" given that the defendants' accountant estimated the changes to be worth over $16 million per year ($12,474,093 for the Enhanced Terms of Employment and $3,819,807 for the conversion to employee status).[57] The accountant estimated the value of the Enhanced Terms of Employment by first determining a per-shift value and then multiplying that by the estimated number of shifts worked per year by all dancers. He estimated the value of the conversion to employee status by adding "the legally required benefits of employment" to "the 'enhanced' benefits of employment set forth in the settlement." For both calculations, he adjusted for the benefits of the prior Michigan settlement so as to avoid double-counting the settlement benefits.[58] He based his calculations on, among other documents, computer reports from four representative Clubs from 2017 and 2019 showing, "among other things, the number of Entertainers performing, dates of performances, hours performed, gross Dance Fee revenues generated by Entertainers, and net Dance Fees paid by the Clubs to the Entertainers."[59]

Because the negotiations with the objectors increased the length of the Enhanced Terms of Employment from one to two years, "the value of the settlement . . . increased by at least $1,000,000."[60]

---

[56] Mot., *id.* – ECF No. 239 at 22–23; Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 92 (¶ 9.1); Defts.' Reply, *id.* – ECF No. 249 at 16; Thompson Decl., *id.* – ECF No. 239-1 at 25 (¶ 88); Amendment to Settlement Agreement, Ex. 1 to Young Decl., *id.* – ECF No. 263-1 at 5–6 (¶ 9.1).

[57] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 80 (¶ 5.2(c)); Defts.' Reply, *id.* – ECF No. 249 at 18–19; Shindel Mem., Ex. 4 to Shindel. Decl., *id.* – ECF No. 243 at 135–38.

[58] Shindel Mem., Ex. 4 to Shindel. Decl., *id.* – ECF No. 243 at 135.

[59] Shindel Decl., Ex. B to Cahill Decl., *id.* – ECF No. 243 at 20–22 (¶¶ 17–19).

[60] Pls.' Suppl. Br., *id.* – ECF No. 263 at 4–5.

United States District Court
Northern District of California

### 3.3    Release

The release is, in short, a release of all claims under federal or state law that were pleaded or could have been pleaded under the facts alleged in the complaints or the Amended Complaints for Settlement, plus any claims "that are reasonably related" to those pleadings, "from the beginning of [Settlement Class Members'] applicable Class Period(s) up to and including November 16, 2018." As to the FLSA claims, only members who consent to join will be bound by the FLSA release. The Settlement Checks will contain opt-in language indicating a Settlement Class Member's consent to join the settlement and to release the FLSA claims.[61]

Separate releases were agreed to by the objectors in exchange for resolution of their objections. They have agreed to "a full and final release of all claims [they] have alleged against [the defendants], including in connection with the related lawsuits, *Hughes v. S.A.W. Entertainment, LTD* (Case No. 3:16-cv-03371-LB) and *Pera et al v. Saw Entertainment Ltd.* (Case No. 3:17-cv-00138-LB)."[62]

### 3.4    Administration

Simpluris, Inc. is the proposed Settlement Administrator. "Class Counsel has experience with Simpluris . . . and have found it to be a competent and competitive[ly] priced settlement administrator."[63]

Simpluris will mail (and email if available) the Class Notice and Dance Fee Payment Election Form and create a website with the Notice and other important information. If mail is returned within twenty-one days with a forwarding address, the administrator will resend it. If there is no forwarding address, the administrator will perform a skip trace using the National Change of Address database and send the Notice to any new address. As a result of negotiations with the objectors, a reminder notice will be sent "no later than 90 days after the third installment

---

[61] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 61–62 (¶ 2.64), 65–69 (¶ 2.85), 78 (¶ 4.12), 86 (¶ 6.5), 100–105 (¶¶ 12.1–12.13).

[62] Pls.' Suppl. Br., *id.* – ECF No. 263 at 3.

[63] Thompson Decl., *id.* – ECF No. 239-1 at 28 (¶ 97); Simpluris Estimate, Ex. C to *id.* – ECF No. 239-1 at 266–70.

United States District Court
Northern District of California

payment." The administrator will also publish the Notice by posting it in each Club's dressing room and keeping it there for ninety days after the filing date for the motion for final approval. The Notice will be posted on the StripperWeb.com "Stripping (was Stripping General)" discussion thread (as suggested by the Ninth Circuit, *Roes 1–2*, 944 F.3d at 1047) for eight weeks. The Notice will be provided to the International Entertainment Adult Union and the Settlement Administrator will "request" that the Union post the Notice on its internet message board and email the Notice to its subscriber list. The Notice will be given through online advertising campaigns directed at social-media websites ("funded in the total amount of $10,000"). The Electronically Posted Notices will have hyperlinks to the Settlement Website.[64]

The Settlement Agreement sets out the procedures for exclusions and objections. Settlement Class Members have at least sixty days to object to or opt out of the Settlement and to elect to receive Dance Fee Payments. No later than thirty days before the expiration of the opt-out period, the administrator will send reminder notices by mail and email and through the International Entertainment Adult Union.[65]

The Settlement Administrator must file with the Court the Due Diligence Declaration verifying that the Class Notices have been effectuated.[66]

## ANALYSIS

### 1. Jurisdiction

The court has diversity jurisdiction under the Class Action Fairness Act (CAFA). 28 U.S.C. § 1332(d)(2).

---

[64] Mot., *id.* – ECF No. 239 at 23–24; Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 74–79 (¶¶ 4.1–4.10); Notices, Exs. D, G & H to *id.* – ECF No. 239-1 at 244–53, 262, 264; Amendment to Settlement Agreement, Ex. 1 to Young Decl., *id.* – ECF No. 263-1 at 6.

[65] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 99–100 (¶¶ 11.1–11.5).

[66] *Id.* at 79 (¶ 4.14).

United States District Court
Northern District of California

1

## 2. Rule 23 and FLSA

The initial inquiry is whether the settlement meet the requirements for class certification under Rule 23 and for collective actions under the FLSA.

### 2.1    Rule 23 Requirements

The court reviews the propriety of class certification under Federal Rule of Civil Procedure 23(a) and (b). When parties enter into a settlement before the court certifies a class, the court "must pay 'undiluted, even heightened, attention' to class certification requirements" because the court will not have the opportunity to adjust the class based on information revealed at trial. *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Class certification requires the following: (1) the class is so numerous that joinder of all members individually is "impracticable"; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the person representing the class will fairly and adequately protect the interests of all class members. Fed. R. Civ. P. 23(a); *Staton*, 327 F.3d at 953. Also, the common questions of law or fact must predominate over any questions affecting only individual class members, and the class action must be superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

The court finds (for settlement purposes only) that the proposed settlement class meets the Rule 23(a) prerequisites of numerosity, commonality, typicality, and adequacy. Also, under Rule 23(b)(3) (and for settlement purposes only), common questions predominate over any questions affecting only individual members, and a class action is superior to other available methods.

First, with over 8,000 members, the class is numerous. *Nelson v. Avon Prods.*, No. 14-cv-02276-BLF, 2015 WL 1778326, at *5 (N.D. Cal. Apr. 17, 2015) (finding that a class of 187 employees satisfied the numerosity requirement provided by Rule 23(a)(1)).

Second, there are questions of law and fact common to the class. All class members worked for one of the defendant nightclubs as dancers. Common questions include whether they were classified properly as independent contractors and whether the defendants' practice of not paying

United States District Court
Northern District of California

1 minimum wage and not paying overtime violated federal, state or local law. Thus, the claims

2 depend on common contentions, the determination of which "will resolve an issue that is central to

3 the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

4 350 (2011); *Betorina v. Randstad US, L.P.*, No. 15-cv-03646-EMC, 2017 WL 1278758, at *4

5 (N.D. Cal. Apr. 6, 2017). Furthermore, these common questions predominate over any questions

6 affecting only individual members.

7      Third, the claims of the representative parties are typical of the claims of the class. All have

8 worked as dancers for the defendants during the class period, and all class members allege wage-

9 and-hour violations based on similar facts. All representatives possess the same interest and suffer

10 from the same injury. *Betorina*, 2017 WL 1278758, at *4.

11      Fourth, the representative parties will fairly and adequately protect the interests of the class.

12 Two factors are relevant to the adequacy determination: (1) whether the named plaintiffs and their

13 counsel have potential conflicts with the other class members; and (2) whether counsel chosen by

14 the representative party is qualified, experienced, and able to vigorously conduct the litigation. *In

15 re Hyundai and Kia Fuel Econ. Litig.*, 926 F.3d 539, 566 (9th Cir. 2019) (citing *Hanlon*, 150 F.3d

16 at 1020). Here, the named plaintiffs have shared claims and interests with the class (and no

17 conflicts of interest), and they retained qualified and competent counsel who have prosecuted the

18 case vigorously.[67] *See id.*; *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands,

19 Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001); *Hanlon*, 150 F.3d at 1021–22.

20      Fifth, a class action is superior to other available methods for fairly and efficiently

21 adjudicating the controversy. Fed. R. Civ. P. 23(b)(3); *Brown v. Hain Celestial Grp., Inc.*, No. 11-

22 cv-03082-LB, 2014 WL 6483216, at *15–20 (N.D. Cal. Nov. 18, 2014).

23      In sum, the prerequisites of Rule 23(a) and (b)(3) are met. The court certifies the class under

24 Rule 23(b)(3) for settlement purposes only.

25

26

27

28

[67] Class Representative Decls., *id.* – ECF Nos. 239-3 to -6; Sommers Schwartz Firm Resume, Ex. A to Thompson Decl., *id.* – ECF No. 239-1 at 36–45.

United States District Court
Northern District of California

1    **2.2    FLSA Class**

2        The FLSA authorizes "opt-in" representative actions where the complaining parties are

3    "similarly situated" to other employees. 29 U.S.C. § 216(b); *see generally Tyson Foods, Inc. v.*

4    *Bouaphakeo*, 577 U.S. 442, 448 (2016). Here, all class members have worked as dancers for one

5    or more defendants during the class period, and their wage-and-hours claims — and related issues

6    such as independent-contractor status — present common fact and law questions under federal and

7    California law. The court certifies the FLSA class for settlement purposes only.

8

9    **3.    Preliminary Approval of Settlement**

10        A court may approve a proposed class-action settlement only "after a hearing and only on

11    finding that it is fair, reasonable, and adequate after considering whether":

12            (A) the class representatives and class counsel have adequately represented the
             class;

13
14            (B) the proposal was negotiated at arm's length;

            (C) the relief provided for the class is adequate, taking into account:
15
                 (i) the costs, risks, and delay of trial and appeal;
16
                 (ii) the effectiveness of any proposed method of distributing relief to the
17               class, including the method of processing class-member claims;

18               (iii) the terms of any proposed award of attorney's fees, including timing of
                 payment; and

19               (iv) any agreement required to be identified under Rule 23(e)(3); and
20
            (D) the proposal treats class members equitably relative to each other.

21    Fed. R. Civ. P. 23(e)(2). These factors "are substantially similar to those articulated" in *Hanlon*,

22    150 F. 3d at 1027. *Student A v. Berkeley Unified Sch. Dist.*, No. 17-cv-02510-JST, 2021 WL

23    6332353, at *2 n.2 (N.D. Cal. July 8, 2021).

24        In *Hanlon*, the Ninth Circuit identified factors relevant to assessing a settlement proposal: (1)

25    the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further

26    litigation; (3) the risk of maintaining class-action status throughout trial; (4) the amount offered in

27    settlement; (5) the extent of discovery completed and the stage of the proceeding; (6) the

28

experience and views of counsel; (7) the presence of a government participant; and (8) the reaction of class members to the proposed settlement. 150 F.3d at 1026.

When parties "negotiate a settlement agreement before the class has been certified, settlement approval requires a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Roes 1–2*, 944 F.3d at 1048 (cleaned up). "Specifically, such settlement agreements must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Id.* at 1048–49 (cleaned up).

The court has evaluated the proposed settlement agreement for overall fairness and concludes that it is free of collusion and approval is appropriate.

First, preliminarily, the settlement value is fair, reasonable and adequate.

It is within the range of possible approval. The settlement's gross amount of $6.5 million (which, again, is a very conservative estimate of the monetary benefits, particularly those resulting from the changed business practices) recovers about fourteen percent of the claimed best-case damages scenario of $45.8 million.[68] Courts routinely assess a class's recovery by comparing the gross rather than net settlement amount to the best-case damages scenario, *see, e.g.*, *Viceral v. Mistras Grp., Inc.*, No. 15-cv-02198-EMC, 2016 WL 5907869, at *2, *7–8 (N.D. Cal. Oct. 11, 2016), and twelve percent of the best-case scenario is within the range courts approve. The plaintiffs identify the following settlements.[69]

| Case | Recovery |
|---|---|
| *Viceral*, 2016 WL 5907869, at *3, *7 | 8.1% |
| *Leverage v. Traeger Pellet Grills, LLC*, No. 16-CV-00784, 2017 WL 2797811, at *7 (N.D. Cal. June 28, 2017) | 18% |
| *In re Newbridge Networks Sec. Litig.*, No. No. CIV. A. 94–1678–LFO, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) | 6–12% |
| *Strube v. Am. Equity Inv. Life Ins. Co.*, 266 F.R.D. 688, 698 (M.D. Fla. 2005) | 2% |

---

[68] Thompson Decl., *id.* – ECF No. 239-1 at 8–10 (¶¶ 26–34), 31–32 (¶ 113).

[69] Mot. *id.* – ECF No. 239 at 31–32.

| | |
|---|---|
| *In re Toys R Us-Del., Inc.*, 295 F.R.D. 438, 453–54 (C.D. Cal. 2014) | 3% |
| *Reed v. 1-800 Contacts Inc.*, No. 12–cv– 02359 JM (BGS), 2014 WL 29011, at *6 (S.D. Cal. Jan. 2, 2014) | 1.7% |
| *In re Payment Card Interchange Fee & Merch. Discount Antitrust Litig.*, 986 F. Supp. 2d 207, 229 (E.D.N.Y. 2013) | 2.5% |

Moreover, the parties' $2 million minimum valuation of the settlement's changed business practices is adequately proven. The changes represent an ascertainable and largely monetary benefit to the Class.[70] Based on the defendants' detailed computer data showing the compensation and shift-length history of individual dancers (as recorded by "the use by the [dancer] herself of an electronic fob tied into the computer program"), the defendants' accountant was able to accurately quantify the value of the changed business practices.[71] And again, the $2 million valuation is a conservative estimate — as detailed above, the accountant's actual estimate was far above that amount. The court credits the valuation.

The now-withdrawn objection alerted the court to two potential issues with the plaintiffs' best-case damages estimate of $45.8 million. First, in declarations submitted with the prior final-approval motion, Class Counsel "aggressively" estimated minimum-wage damages of $75.8 million.[72] By contrast, their current declarations estimate per-dancer minimum-wage damages that, when multiplied by the 8,408 class members, amount only to about $323,000.[73] This difference is unexplained in the current settlement's briefing. But even if $75 million should be added to the best-case damages estimate, such that the proper figure is $120 million, the Settlement Consideration of $6.5 million is a 5.4% recovery, which is within the range courts approve (as shown by the chart above).

---

[70] Defts.' Reply, *id.* – ECF No. 249 at 16–19.

[71] Cahill Decl. in Supp. of Defts.' Reply to Obj., *id.* – ECF No. 249-1 at 2 (¶ 3); Shindel Decl. & Exs., Ex. B to Cahill Decl., *id.* – ECF No. 243 at 14–148.

[72] Tidrick Decl., *id.* – ECF No. 163-1 at 3 (¶ 8).

[73] Thompson Decl., *id.* – ECF No. 239-1 at 9 (¶ 30).

Second, the objectors claimed that "the [current] damages analysis . . . fails to account for what is likely the strongest claim in the case — the claim to recover house fees and stage fees."[74] The defendants responded that the Clubs have not charged house or stage fees ("which are amounts the dancers paid out-of-pocket to work a shift at the clubs") since 2000 (before the Class Periods) and that since then, dancers have simply been paid a "contractually agreed upon percentage" of the mandatory service charges paid by customers.[75] The objectors, however, pointed to a declaration by the plaintiff in *Hughes* stating that she was "required to pay back" to the Clubs a house fee of "between $40–$150" each time she worked a shift.[76] Moreover, the complaints in both the San Francisco and San Diego cases allege damages resulting from house or stage fees.[77] But even if house fees should be added to the best-case damages scenario, such that the proper figure is higher than $120 million, the settlement can still be adequate. As shown by the chart above, courts have approved settlements in the one to two percent range (and the house fee damages would have to be $205 million for the Settlement Consideration to be a two-percent recovery, which is implausible). And again, the $6.5 million Settlement Consideration is a conservative estimate.

That the changed business practices were first implemented in 2018 does not negate their value for purposes of analyzing the settlement. They are a product of the parties' settlement negotiations — they were put in place only after the defendants were sued and entered into the prior settlement in the San Diego Action.[78]

Furthermore, the recovery needs to be seen in context. The defendants' computer data shows that most Settlement Class Members worked very few overtime hours — "the average hours performed was 5.3 hours per day."[79] It also shows that Settlement Class Members, on average,

---

[74] Objection,Obj., *id.* – ECF No. 244 at 7 n.3.

[75] Defts.' Reply, *id.* – ECF No. 249 at 12–13.

[76] Hughes Decl., *Hughes*, No. 16-cv-03371-LB – ECF No. 31-1 at 4 (¶ 13).

[77] Am. Compl., San Francisco Action – ECF No. 11 at 22–23 (¶¶ 79, 83); First Am. Compl., San Diego Action – ECF No. 1-42 at 29 (¶ 117).

[78] Defts.' Reply, San Francisco Action – ECF No. 249 at 16–17.

[79] *Id.* at 31; Thompson Decl., *id.* – ECF No. 239-1 at 9 (¶ 28); Defts.' Reply, *id.* – ECF No. 249 at 9; Shindel Mem., Ex. 4 to Shindel. Decl., *id.* – ECF No. 243 at 144.

United States District Court
Northern District of California

were paid $34.89 per hour by the Clubs.[80] That amount consisted of mandatory service charges, not tips.[81] Thus, as the defendants assert, the claims for overtime and minimum wage damages would be minimal.[82] The settlement value is reasonable, given the amount of work performed and wages received by Settlement Class Members.

There are also litigation and recovery risks that are relevant to the fairness analysis.

The recovery risk is the effect of the COVID-19 pandemic on the Clubs. For example, "the San Francisco Nightclubs were required to close . . . and generated no operating revenues for over a year." Moreover, they were excepted from relief under the CARES Act.[83] One defendant recently declared bankruptcy, and five of the Clubs have closed permanently.[84] Class Counsel also reviewed "summary financial information showing the dire economic circumstances" of the Clubs.[85] Objector counsel did too.[86] This financial hardship is relevant to the settlement-fairness analysis, especially because the defendants' ability to absorb a large judgment is questionable. *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("Here one factor predominates to make clear that the district court acted within its discretion [in approving the settlement]. That factor is [the defendant's] financial condition."); *Sandoval Ortega v. Aho Enters., Inc.*, No. 19-cv-00404-DMR, 2021 WL 5584761, at *7–8 (N.D. Cal. Nov. 30, 2021) (taking the defendants' "financial condition" into account in evaluating the settlement amount and noting their "financial constraint and hardship" as a result of the pandemic); *In re Toys R Us*, 295 F.R.D. at 452

---

[80] Defts.' Reply, *id.* – ECF No. 249 at 9, 12; Shindel Mem., Ex. 4 to Shindel. Decl., *id.* – ECF No. 243 at 138, 144.

[81] Defts.' Reply, *id.* – ECF No. 249 at 10–11 & n.6.

[82] *Id.* at 8–12.

[83] Marlin Decl., Ex. C to Cahill Decl., *id.* – ECF No. 243 at 151–52 (¶ 5); Carlson Decl., Ex. D to *id.* – ECF No. 243 at 154–58; *Deja Vu-San Francisco LLC v. U.S. Small Bus. Admin.*, No. 20-cv-03982-LB, 2020 WL 6260010, at *7 (N.D. Cal. Sept. 11, 2020).

[84] Bankruptcy Notice, San Diego Action – ECF No. 108; Thompson Decl., San Francisco Action – ECF No. 239-1 at 31 (¶ 111).

[85] Mot., San Francisco Action – ECF No. 239 at 38; Thompson Decl., *id.* – ECF No. 239-1 at 31 (¶ 111).

[86] Liss-Riordan Decl., *id.* – ECF No. 266 at 3 (¶ 6).

United States District Court
Northern District of California

(finding that damages could be "catastrophic" for the defendant, which "weigh[ed] in favor of [settlement] approval").

There are other litigation risks.[87] One is that the plaintiffs would be unable to certify a class, "due to, among other reasons, the arbitration agreements with comprehensive class and collective action waivers."[88] *Cf. Zackaria v. Wal-Mart Stores, Inc.*, No. ED CV 12–1520, 2015 WL 2412103, at *16 (C.D. Cal. May 18, 2015) (denying class certification as to claims that asset protection coordinators were misclassified as exempt because analyzing how employees spent their time is an individual question). It would also be difficult, in a case like this, to prove both liability and damages on a classwide basis — for example, overtime claims would be difficult to establish (as discussed above).[89] That is especially true because the defendants have grounds to argue that the plaintiffs' alleged minimum wage damages should be offset by the prior compensation they received from the Clubs, which was in excess of the minimum wage. Some courts have accepted that argument, including the Eastern District of Michigan in a case before the Michigan action.[90]

It is even possible that the court could reject the plaintiffs' core argument that they were misclassified as independent contractors. For example, the "ABC" test, favorable to the plaintiffs' misclassification argument and adopted by the California Supreme Court in *Dynamex*, applies only to their Industrial Welfare Commission Wage Order-based claims. As to their Labor Code claims — to which the less-favorable *Borello* test applies — "[t]here are courts that have found that dancers are independent contractors under similar legal standards [and] similar facts."[91] In one case involving one of the same defendants as here, the California Court of Appeal affirmed a jury verdict finding that the dancer-plaintiff was properly classified as an independent contractor. *Buel*

---

[87] Mot., *id.* – ECF No. 239 at 33–38; Thompson Decl., *id.* – ECF No. 239-1 at 10–14 (¶¶ 34–37).

[88] Mot., *id.* – ECF No. 239 at 34.

[89] Thompson Decl., *id.* – ECF No. 239-1 at 33 (¶¶ 117–18).

[90] Mot., *id.* – ECF No. 239 at 35; Defts.' Reply, *id.* – ECF No. 249 at 8–12 (collecting cases).

[91] Mot., *id.* – ECF No. 239 at 34; Thompson Decl., *id.* – ECF No. 239-1 at 32–33 (¶ 116).

*v. Chowder House, Inc.*, No. A108951, 2006 WL 1545860, at *1 (Cal. Ct. App. June 7, 2006). The parties collected similar cases.[92]

Also, as to the Wage Order claims, the defendants were likely to argue that dancers "fall within the statutory exemptions for professionals and are not subject to overtime and other provision of the Wage Orders."[93] In any case, *Dynamex* did not guarantee a favorable misclassification finding for the plaintiffs. The defendants were going to argue that applying *Dynamex* retroactively would violate federal due process (and no federal court has yet decided that issue), because (1) "*Dynamex* establishes a fundamental change in California law," (2) several of the defendants in these cases prevailed on worker misclassification claims under the previously applicable standard, and (3) "in light of the breadth of . . . *Dynamex*, the California legislature was quick to adopt a myriad of statutory *exceptions* in order to rein [its] application."[94]

"It is also worth noting that many, if not all, of the Class Members elected to Perform as independent contractors, and not as employees, when given the option." Such election raises "potential issues of estoppel, *in pari delicto*, and other equitable considerations . . . which could negate or substantially reduce any recovery."[95] *Cf. Chowder House*, 2006 WL 1545860, at *9–10 (where a plaintiff voluntarily chooses to work as an independent contractor, she is more likely to be properly classified as such).

The defendants raised further defenses in the parties' negotiations: (1) the compensation paid to dancers came from mandatory service charges, not tips, so the defendants did not engage in unlawful tip sharing; (2) many dancers lack standing to pursue their wage claims "and/or may have difficulty in proving their damages because they never filed tax returns and therefore neither reported their tip income nor paid taxes"; (3) the plaintiffs "cannot prove their joint employer allegations"; (4) "the text of the PAGA statute is unclear as to whether PAGA penalties may be 'stacked'" and in any case, "recovery of the full 'stacked' amount . . . is highly unlikely because of

---

[92] Defts.' Reply, *id.* – ECF No. 249 at 24 n.10; Mot., *id.* – ECF No. 239 at 34.

[93] Thompson Decl., *id.* – ECF No. 239-1 at 32–33 (¶ 116).

[94] Defts.' Reply, *id.* – ECF No. 249 at 13–15.

[95] Mot., *id.* – ECF No. 239 at 35–36.

the facts of the case and . . . the trial court's discretion to reduce PAGA penalties"; (5) the

plaintiffs' meal- and rest-break claims have negligible value because (a) the defendants' "evidence

shows that aggrieved employees exercised complete autonomy over when or whether to take a

meal [or] rest break, and (b) "neither meal nor rest breaks were legally required in most of the

circumstances here," given the dancers' average shift length; (6) the defendants did not act

willfully, so no penalties are available under Cal. Lab. Code §§ 201–03; (7) penalties under Cal.

Lab. Code § 226 could be reduced because of the defendants' good-faith belief regarding the

plaintiffs' proper classification; (8) under § 226, penalties could be limited to $25,000 total

because the defendants did not engage in a "pattern or practice" of willful misclassification; and

(9) PAGA claims are subject to individual arbitration, which is particularly significant in light of

the Supreme Court's grant of certiorari in *Viking River Cruises, Inc. v. Moriana* "to answer the

question of whether the Federal Arbitration Act preempts a California Supreme Court ruling that

arbitration agreements waiving the right to bring representative actions under PAGA [are]

unenforceable."[96]

 In light of the relevant context and litigation and recovery risks, the settlement value is fair,

reasonable and adequate.

 Second, a settlement now results in money paid now, while litigation results in delay and

expense. In cases with such an extensive history, this is a substantial concern. Moreover, "[t]his

concern is particularly acute in a case such as this where the Class Members, by general nature,

are more transient and difficult to find to secure testimony and evidence, and to deliver benefits to,

as time goes by."[97] The settlement allows both parties to avoid contested litigation that would be

costly and protracted.

 Third, a class action allows Settlement Class Members — who otherwise would not pursue

their claims individually because costs would exceed recoveries — to obtain relief. And here,

there are additional reasons Class members would not pursue individual claims: they may be

---

[96] *Id.* at 36–37.

[97] Mot., *id.* – ECF No. 239 at 39.

1    reluctant "given the nature of the work," and "over three years has lapsed since the end of the

2    Class Period[s]."[98]

3         Fourth, the settlement is the product of serious, non-collusive, arm's-length negotiations. It

4    was reached after multiple mediations and extensive settlement negotiations over the course of

5    years, as detailed above.

6         Fifth, the PAGA allocation is within the range of reasonable settlements. *See, e.g.*, *Viceral*,

7    2016 WL 5907869, at *8–9.

8         Finally, the settlement addresses concerns identified by the Ninth Circuit. It is non-

9    reversionary, contains no agreement about the fee request beyond an upper cap, and reduced the

10   enhancement payments consistent with the court's general approach (discussed below). *Roes 1–2*,

11   944 F.3d at 1048–60. The Dance Fee Pool is fully non-reversionary and therefore its value is

12   easily ascertainable.[99] Making its value even more easily ascertainable is the fact that, regardless

13   of whether a Settlement Class Member chooses a Cash Payment or a Dance Fee Payment, the

14   payment amount will be the same: the member's share of Form 1099 Payments multiplied "by the

15   combined sum of the Net Cash Fund and the Dance Fee Pool."[100] (The amount of attorney's fees,

16   another of the Ninth Circuit's concerns, will not be determined until after Class Counsel's motion

17   at the final approval stage.)

18        In sum, the court finds that viewed as a whole, the proposed settlement is sufficiently fair,

19   adequate, and reasonable. Fed. R. Civ. P. 23(e)(2). The court approves the settlement.

20        For the same reasons, the court approves the settlement of the FLSA collective action.

21        The court will address the issue of attorney's fees for class counsel at the final fairness hearing.

22   *See Hanlon*, 150 F.3d at 1029 (twenty-five percent is a benchmark in common fund cases); *cf.*

23   *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) (twenty-five percent benchmark,

24

25

26

27   ───────────────

[98] Thompson Decl., *id.* – ECF No. 239-1 at 33 (¶ 119).

[99] Pls.' Reply, *id.* – ECF No. 247 at 6.

28   [100] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 85 (¶ 6.3.1).

1    though a starting point for analysis, may be inappropriate in some cases; fees must be supported

2    by findings).

3

4    ### 4.    Appointment of Class Representatives, Class Counsel, and Settlement Administrator

5         The court appoints Jane Roes 1 and 2 from the San Diego Action and Jane Roes 1 and 3 from

6    the San Francisco Action as the Class Representatives. They are adequate representatives of the

7    other members of the Class and have claims that are typical of the other members' claims.[101]

8         The court appoints attorneys from three law firms as Class Counsel for settlement purposes

9    only: Joel Young and Steven Tidrick of The Tidrick Law Firm, LLP; Jason Thompson of

10   Sommers Schwartz, P.C.; and Megan Bonanni of Pitt McGehee Palmer & Rivers, P.C. Fed. R.

11   Civ. P. 23(a) & (g)(1). They have sufficient qualifications, experience, and expertise in

12   prosecuting class actions.[102]

13        The court also appoints Simpluris, Inc. as the Settlement Administrator. It will administer the

14   settlement in accordance with the requirements set forth in the Settlement Agreement. The court

15   orders Simpluris to file proof of compliance with the notice program at or before the Fairness

16   Hearing.[103] And the court approves payment of Administrative Costs in the amount of

17   $150,000.[104]

18

19   ### 5.    Class Notice

20        The court approves the class notice and plan. It provides the best notice practicable, satisfies

21   the notice requirements of Rule 23, adequately advises class members of their rights under the

22   settlement agreement, and meets the requirements of due process. *Cf. In re Hyundai and Kia*, 926

23   F.3d at 567 ("Notice is satisfactory if it generally describes the terms of the settlement in sufficient

24

25   [101] Class Representative Decls., *id.* – ECF Nos. 239-3 to -6.

26   [102] Thompson Decl., *id.* – ECF No. 239-1 at 2 (¶¶ 1–4); Sommers Schwartz Firm Resume, Ex. A to *id.* – ECF No. 239-1 at 36–45.

27   [103] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 79 (¶ 4.14).

28   [104] Updated Proposed Order, *id.* – ECF No. 264 at 3 (¶ 8).

United States District Court
Northern District of California

detail to alert those with adverse viewpoints to investigate and to come forward and be heard.")
(cleaned up).

The forms of notice fairly, plainly, accurately, and reasonably provide class members with all required information, including (among other things): (1) a summary of the lawsuit and claims asserted; (2) a clear definition of the class; (3) a description of the material terms of the settlement, including the estimated payment; (4) a disclosure of the release of the claims; (5) the date, time, and location of the final fairness hearing; and (6) the identity of class counsel and the provisions for attorney's fees, costs, and class-representative service awards.[105]

Moreover, the forms of notice eliminate the concerns the Ninth Circuit had with the notice plan in the prior San Francisco Action settlement. *Roes 1–2*, 944 F.3d at 1046–48. Specifically, the notice plan goes well beyond a single mailed notice plus a posting in the Clubs' dressing room. It is robust because it provides for reminder notices and multiple forms of electronic notice, including that specifically suggested by the Ninth Circuit. *Id.* at 1047 (suggesting a posting on StripperWeb.com). Thus, the notice plan is approved.

## 6. Enhancement Payments

District courts must evaluate proposed awards individually, using relevant factors that include "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation." *Staton*, 327 F.3d at 977 (cleaned up). "Such awards are discretionary . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009) (citation omitted). The Ninth Circuit has "noted that in some cases incentive awards may be proper but [has] cautioned that awarding them should not become routine practice . . . ."

---

[105] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 74–79 (¶¶ 4.1–4.10, 4.14); Notices, Exs. D, G & H to *id.* – ECF No. 239-1 at 244–53, 262, 264.

United States District Court
Northern District of California

*Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (discussing *Staton*, 327 F.3d at 975–78). District courts "must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Id.* at 1164. In this district, a $5,000 incentive award is presumptively reasonable. *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (collecting cases).

The court defers consideration of the Enhancement Payments until the Fairness Hearing.

### 7.  Compliance with CAFA

The defendants must timely send the CAFA Notice (which must be in a form approved by Class Counsel) to all appropriate officials under CAFA, 20 U.S.C. § 1715(b).[106] Any final settlement approval will be more than ninety days after service as required by CAFA.

### 8.  Objector Settlement

Any "payment or other consideration . . . provided in connection with . . . withdrawing an objection" to a class-action settlement must be approved by the court. Fed. R. Civ. P. 23(e)(5)(B)(i). The standard for approval varies depending on whether the consideration is provided to objectors or their counsel.

First, consideration provided to objector counsel can be approved only if the objector "substantially enhanced the benefits to the class under the settlement." *Vizcaino*, 290 F.3d at 1051–52; *W. Publ'g Corp.*, 563 F.3d at 963 ($325,000 increase to the settlement fund was a substantial enhancement). The benefit must also be "worth more than the fee [the objectors] are seeking." *Fraley v. Facebook, Inc.*, No. C 11-1726 RS, 2014 WL 806072, at *2 (N.D. Cal. Feb. 27, 2014), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).

"The 'substantial benefit' need not be financial," but if it is not, "the court must carefully scrutinize the benefits conferred" to determine whether they are more than "technical or coincidental." *In re HP Inkjet Printer Litig.*, No. 5:05-CV-3580 JF, 2011 WL 2462475, at *1

---

[106] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 72 (¶ 3.4(b)).

(N.D. Cal. June 20, 2011); *see also Kurihara v. Best Buy Co.*, No. C-06-1884 MHP (EMC), 2010 WL 11575583, at *3 (N.D. Cal. June 7, 2010) (substantial benefit where an objector achieved clarification of the scope of the settlement's releases), *report and recommendation adopted*, No. C-06-1884 MHP(EMC), 2010 WL 11575584 (N.D. Cal. July 6, 2010).

Fees for objector counsel should be evaluated "on the same equitable principles as [fees for] class counsel." *Rodriguez v. Disner*, 688 F.3d 645, 658 (9th Cir. 2012). Thus, "where objectors do not add any new legal argument or expertise," or "do not participate constructively in the litigation," no fees should be awarded. *Id.* at 659.

The amount of any fee award is a matter for the court's discretion. *Id.* at 653. Ordinarily, the award should be based on a percentage of the benefits the objector conferred on the class, and courts in this district have awarded varying percentages depending on the value of the benefits conferred. *See In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 4776946, at *2 (N.D. Cal. Aug. 13, 2015) (awarding 8.8% where the benefit conferred was over $1 million); *Kurihara*, 2010 WL 11575583, at *3 (awarding 29.9% where the benefit conferred was $52,335). Alternatively, as with class counsel fees, "when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors," the percentage calculation can be "replaced by a lodestar calculation." *Wininger v. SI Mgmt. L.P.*, 301 F.3d 1115, 1127 (9th Cir. 2002) (cleaned up).

"[T]he proper procedure" for approval of a payment to objector counsel "is by motion under Rule 23(h) for an award of fees." Fed. R. Civ. P. 23 advisory committee's notes 2018 amendments. Objector counsel "bears the burden of submitting detailed time records justifying the hours claimed to have been expended." *Wininger*, 301 F.3d at 1126.

Second, payments to objectors themselves in connection with withdrawing an objection are evaluated in the same way as incentive awards for named plaintiffs. *Cf. In re Transpacific*, 2015 WL 4776946, at *2. But as with payments to objector counsel, the objector must have "substantially enhanced the benefits to the class under the settlement." *See Fraley*, 2014 WL 806072, at *1–2 (cleaned up).

United States District Court
Northern District of California

1    Here, the objectors withdrew their objections in exchange for (1) enhancement payments

2 totaling $53,000 (with individual payments ranging from $3,500 to $10,000), and (2) $50,000 in

3 attorney's fees for their counsel.[107] The court defers consideration of the requested enhancement

4 payments and attorney's fees until the Fairness Hearing.

### 9.  Procedures for Fairness Hearing

#### 9.1    Deadlines

    The court approves the parties' proposed schedule set forth in exhibit 2 to the Young

Declaration.[108] The dates that the parties left to the court to set will be as follows:

| Event | Date |
|---|---|
| Deadline for mailing of opt-outs and objections: | 60 days after Notice Packets are mailed.[109] |
| Deadline to file motion for final approval: | 15 days after Notice Packets are mailed. |
| Deadline to file motions for attorney's fees and costs and enhancement payments (both class and objector counsel): | 15 days after Notice Packets are mailed. |
| Fairness Hearing: | November 17, 2022, at 9:30 a.m. |

#### 9.2    Fairness Hearing

    At the Fairness Hearing, the court will consider whether to (1) finally approve the Settlement

Agreement and the releases in it, (2) finally approve the Enhancement Payments, (3) award

attorney's fees and costs to Class Counsel, and (4) finally approve the objector settlement. The

court may, for good cause, extend any of the deadlines or continue the Fairness Hearing without

further notice to the Settlement Class Members.

#### 9.3    Objections to or Exclusions from the Settlement

    The objection and exclusion procedures will be those in the Settlement Agreement.[110]

---

[107] Pls.' Suppl. Br., *id.* – ECF No. 263 at 3–4; Amendment to Settlement Agreement, Ex. 1 to Young Decl., *id.* – ECF No. 263-1 at 6–7; Withdrawal of Objs., *id.* – ECF No. 265; Liss-Riordan Decl., *id.* – ECF No. 266.

[108] Chart of Deadlines, Ex. 2 to Young Decl., *id.* – ECF No. 263-1 at 12–14.

[109] Updated Proposed Order, *id.* – ECF No. 264 at 4 (¶ 13–14).

[110] Settlement Agreement, Ex. B to Thompson Decl., *id.* – ECF No. 239-1 at 99–100 (¶¶ 11.1–11.5).

1

**10. Ancillary Items**

2      The court consolidates the San Francisco and San Diego Actions and grants the motion to file

3   the consolidated complaint attached as Exhibit B to the Settlement Agreement. The complaint is

4   filed for settlement purposes only. The cases are consolidated for settlement purposes only in the

5   lower-numbered San Francisco Action. Consolidation is appropriate because the cases involve

6   common issues of law and fact, including the same club brands and entertainers who are potential

7   class members in both lawsuits, and it otherwise expedites the settlement proceedings and

8   eliminates unnecessary repetition and confusion. Fed. R. Civ. P. 42(a); *see In re HP Inkjet Printer*

9   *Litig.*, No. C05-3580 JF, 2010 WL 11488941, at *1 (N.D. Cal. Oct. 1, 2010) (consolidating cases

10  for settlement purposes where the relief provided by the settlement is similar in each and it would

11  be more efficient to administer the settlement in one action).

12      The defendants are deemed to have generally denied the allegations of the complaint without

13  the need to file and serve an answer.[111]

14      Each Settlement Class Member desiring to object to the settlement must submit a timely

15  written statement to the Settlement Administrator that describes the member's objection in

16  specific terms and the reasons for any such objection, including any evidence and legal authority

17  the member wishes to bring to the court's attention and any evidence the member wishes to

18  introduce in support of his or her objection, as well as the member's name, email and postal

19  addresses, and telephone number, and information demonstrating that the member is entitled to be

20  included as a member of the Class.[112]

21      Each Settlement Class Member desiring to opt-out of the settlement must submit a timely

22  written notice to the Settlement Administrator evidence their intention to opt out, as well as the

23  member's name, email and postal addresses, and telephone number.[113]

24

25

26  _____

27  [111] *Id.* at 72 (¶ 3.4(a)).

    [112] Updated Proposed Order, *id.* – ECF No. 264 at 4 (¶ 13).

28  [113] *Id.* (¶ 14).

United States District Court
Northern District of California

United States District Court
Northern District of California

The defendants will provide the Settlement Administrator a list of the Settlement Class Members within thirty days from the date of this Preliminary Approval Order.[114] The Settlement Administrator must send out the Notice Packets to the Settlement Class Members, in the manner and form approved by the court, no later than twenty days after the defendants provide the Settlement Administrator a list of the Settlement Class Members.[115] Before the Fairness Hearing, Class Counsel and the defendants must file with the court an appropriate affidavit or declaration attesting to the parties' compliance with the distribution of notice as set forth in this order.[116]

All discovery and pretrial proceedings in this Action are stayed and suspended until further order of the court.[117]

Neither the Settlement Agreement, nor the terms contained therein, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement or the settlement: (a) is or may be deemed to be, or any be used as an admission of, or evidence of, the validity or lack thereof of any Released Claim, or of any wrongdoing or liability of the defendants; or (b) is or may be deemed to be, or may be used as an admission of, or evidence of, any fault or omission of the defendants, in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal.[118]

## CONCLUSION

The court (1) certifies the Class for settlement purposes only, (2) preliminarily approves the settlement and authorizes notices as set forth in this order, (3) provisionally appoints the Class Representatives, Class Counsel, and Simpluris, Inc., and (4) orders the parties and Simpluris to carry out their obligations in the Settlement Agreement. The Fairness Hearing will be on November 17, 2022, at 9:30 a.m.

---

[114] *Id.* at 3 (¶ 9).

[115] *Id.* (¶ 10).

[116] *Id.* (¶ 11).

[117] *Id.* at 4 (¶ 16).

[118] *Id.* at 4–5 (¶ 17).

1    This disposes of ECF Nos. 239 (San Francisco Action) and 107 (San Diego Action).

2    **IT IS SO ORDERED.**

3    Dated: June 30, 2022

4    _____

5    LAUREL BEELER
     United States Magistrate Judge